# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN KOLTONUK                           :
Plaintiff,                              :
                                        :
         v.                             :          CIVIL ACTION
                                        :
BOROUGH OF LAURELDALE, et al.,          :          NO. 05-0106
Defendants.                             :
                                        :
                                        :

## Memorandum and Order

YOHN, J.                                            July ___, 2006

    Plaintiff John Koltonuk, a former police officer of the Borough of Laureldale (the

"Borough"), has brought a 42 U.S.C. § 1983 action charging the Borough with: 1) violating his

Fourteenth Amendment right to due process by terminating his employment without providing

him adequate pretermination and posttermination hearings; and 2) violating his First Amendment

right to petition for a redress of grievances by filing criminal charges against him in retaliation

for his pursuing posttermination remedies to challenge his discharge.  Koltonuk has filed a

motion for partial summary judgment on the due process claim, and the Borough has filed a

motion for summary judgment on both claims.  For the reasons that follow, the court will grant

judgment to the Borough and against Koltonuk on the due process claim, but will deny the

Borough's motion on the retaliation claim.

## I. Factual Background

    While employed by the Borough as a police officer, Koltonuk intermittently was required

to clean the garage area of Borough Hall where the police force parked its cars.  (Koltonuk Dep.

55:10-15.)  Several years ago, Koltonuk asked the manager of his local Turkey Hill Market

("Turkey Hill"), Jane McLean, if her store would provide him with garbage bags that he could use to clean the garage.  (Koltonuk Dep. 56:15-22.)  McLean permitted Koltonuk to take some bags that were normally reserved for store use from the store's storage room.  (Koltonuk Dep. 56:15-22.)  Koltonuk continued to go to Turkey Hill for garbage bags for use in his subsequent garage cleanings.  (Koltonuk Dep. 60:4-8.)  On each of these occasions Koltonuk asked for and received permission from either McLean or a store clerk to take some bags.  (Koltonuk Dep. 60:16-23.)

On January 14, 2003, after having been instructed to clean the garage, Koltonuk returned to Turkey Hill for trash bags.  (Pl.'s Mot. for Summ. J. 4.)  However, this time Koltonuk did not ask the store clerk for permission to take the bags.  (Koltonuk Dep. 70:8-12.)  He walked back to the storage area, put two or three bags in his coat, and walked out of the store.  (Koltonuk Dep. 70:21-23, 73:16-24.)  The clerk then called a police officer and reported that Koltonuk had stolen trash bags.[1]  (Mench Dep. 12:18-13:8.)

After the chief of police, Edward Mench, received this report, he met with the Borough's solicitor, John Speicher, and the Borough's mayor.[2]  (Mench Dep. 13:16-22, 16:18-24.)  The mayor and solicitor instructed Mench to prepare a letter of resignation for Koltonuk to sign.  (Mench Dep. 16:21-22.)

On January 17, 2003, Mench, Officer Mark Sokolovich, and Koltonuk met at the police

---

[1] The court will hereinafter refer to this event as the "Turkey Hill incident."

[2] Here, Mench refers to the mayor as "Manzella." (Mench's Dep. 13:17-18.)  However, when Koltonuk's lawyer later wrote letters to various officials, he wrote one to the mayor, whom he referred to as George Sobreski (Def.'s Ex. 7), and one to the council president, whom he referred to as Dominic Manzella (Def.'s Ex. 8).  At this point the discrepancy is not consequential.

station.  (Koltonuk Dep. 79:13-24, 81:8.)  Mench informed Koltonuk that the meeting would be a

"*Loudermill* hearing."  (Koltonuk Dep. 81:12-15.)  Mench told Koltonuk that there had been a

report that Koltonuk had stolen trash bags from the Turkey Hill Market.  (Koltonuk Dep. 82:4-5.)

Mench also showed Koltonuk the complaint that the clerk from Turkey Hill had filed.  (Koltonuk

Dep. 89:19-24, 91:2-5.)  Koltonuk admitted taking the garbage bags, but claimed that he had

permission to take them for Borough use.  (Koltonuk Dep. 82:20-22.)  Nonetheless, Mench

handed Koltonuk a letter of resignation that Sokolovich had drafted.  (Koltonuk Dep. 85:22-24,

87:4-8.)  Mench told Koltonuk that "we can make this go away, just sign this letter and resign."

(Koltonuk Dep. 87:11-12.)  Mench further told Koltonuk that if he did not resign, he would be

suspended, "could/would" be fired, and that the matter would be turned over to the district

attorney's office or the state police.  (Koltonuk Dep. 91:21-23, 94:20-23.)  Mench also told

Koltonuk that if he were fired, it could affect his pension.  (Koltonuk Dep. 94:21.)  As Koltonuk

considered the letter with pen in hand, Mench held Koltonuk's hand on the table and told him to

make sure that he read and understood the letter before signing.  (Mench Dep. 15:16-16:7.)

Koltonuk did sign the letter that day.  (Koltonuk Dep. 87:23-24.)

　　　　After leaving the station, Koltonuk called his lawyer.  (Def.'s Ex. 7.)  On his lawyer's

advice, Koltonuk then faxed a letter the same day to Mench and the Borough's secretary/treasurer

withdrawing his resignation.  (Def.'s Ex. 6.)  Koltonuk claimed that he had been pressured into

signing the resignation letter.  (*Id.*)

　　　　On January 27, 2003, Koltonuk's lawyer mailed a letter to the mayor explaining that

Koltonuk had withdrawn his letter of resignation and inquiring when Koltonuk would be

scheduled for work.  (Def.'s Ex. 7.)  The mayor did not respond to this query.  In a letter dated

February 25, 2003, Koltonuk's attorney asked the president of the Borough Council about the

status of Koltonuk's employment and informed him that if he did not hear anything to the

contrary by March 15, 2003, he would assume that Koltonuk had been constructively discharged.

(Def.'s Ex. 8.)  Despite these letters, when the Borough Council met on March 10, 2003, it

considered Koltonuk's situation only as follows:

> President Manzella informed all council members that Officer Koltonuk resigned
> effective January 17, 2003.  He subsequently indicated he would like to get his job
> back.  Is there a motion to consider rehiring him?  Since no council member made
> a motion the resignation will stand.

(Appx. to Pl.'s Reply at 57.)  By letter dated March 14, 2003, the Borough's solicitor, Speicher,

informed Koltonuk's lawyer that the Borough had considered Koltonuk's desire to be rehired but

was not willing to rehire him.  (Def.'s Ex. 9.)  In a letter dated March 18, 2003, Koltonuk's

lawyer argued to Speicher that when the Borough failed to recognize Koltonuk's revocation of

his resignation, it had fired him, and he thus was entitled to a hearing before the Borough of

Laureldale Civil Service Commission (the "Commission").  (Def.'s Ex. 10.)  Koltonuk's lawyer

cited the Pennsylvania Commonwealth Court case *Iorio v. Borough of Carnegie* as support for

this proposition.  (*Id.*)  On March 20, 2003, Speicher responded to Koltonuk's lawyer's letter,

expressing the Borough's position that Koltonuk had resigned from his position and therefore

was not entitled to a hearing in front of the Commission.  (Def.'s Ex. 11.)  However, in a May 2,

2003 letter, Speicher informed Koltonuk's lawyer that he had reviewed *Iorio* and concluded that

Koltonuk was entitled to a hearing.  (Def.'s Ex. 12.)  By letter dated May 13, 2003, Koltonuk's

lawyer informed the chairman of the Commission that Koltonuk desired to schedule a hearing.

(Def.'s Ex. 15.)  That letter explained that Koltonuk had signed a letter of resignation and then

submitted a letter withdrawing his resignation, which the Borough refused to recognize.  (*Id.*)

In a letter dated August 1, 2003, Speicher described the Borough's position to the Commission's solicitor.  (Def.'s Ex. 16.)  The letter stated, *inter alia*:

> The Borough has terminated Mr. Koltonuk as a police officer for violation of his official duty, violation of law, disobedience of orders, and conduct unbecoming an officer.  These charges all relate to the incident on January 14, 2003, at approximately 10:00 p.m. at the Turkey Hill Mini Mart in Laureldale, when Mr. Koltonuk, serving as a Laureldale police officer, illegally removed trash bags from a storage room of the Turkey Hill Store, without having permission to do so.

(Def.'s Ex. 16.)  The letter further explained that the Borough intended to present testimony concerning these charges at the hearing that was scheduled for August 14, 2003.  (*Id.*)  This letter implicitly recognized that plaintiff's rescission of his resignation letter prior to its acceptance by the Borough rendered his resignation letter void.

By letter dated August 5, 2003, Koltonuk's lawyer informed the Commission that Koltonuk wished to withdraw his request for a hearing.  (Def.'s Ex. 17.)  The letter explained that Koltonuk preferred to "proceed in another forum" that would be "better suited to resolve all of the issues presented by this case."  (*Id.*)  In deposition testimony, Koltonuk has described two reasons for cancelling his posttermination hearing.  First, he has stated that he feared that the Borough would file criminal charges against him if he proceeded with the hearing.  (Koltonuk Dep. 106:22-107:1, 112:2, 10-11.)  He attributed this belief alternatively to a "gut feeling" and to advice from his lawyer.  (Koltonuk Dep. 107:12-13, 134:11-12.)  Second, he has testified that he did not want to return to work under Mench, because he feared that the working conditions would be poor.  (Koltonuk Dep. 133:1-4, 282:18-20.)

On August 12, 2003, after consulting with Speicher, Sokolovich filed criminal charges

alleging theft against Koltonuk (Def.'s Ex. 21) pursuant to 18 Pa. Cons. Stat. § 3921 (Def.'s Mot. for Summ. J. 23). The charges were dismissed by the district justice following a preliminary hearing on December 29, 2003. (Def.'s Ex. 19.)

On January 10, 2005, Koltonuk filed a complaint against the Borough, Mench, and Sokolovich. The complaint contained seven counts: 1) a due process claim against the Borough; 2) a retaliatory prosecution claim against the Borough; 3) a due process claim under the Local Agency Law against the Borough; 4) a retaliatory prosecution claim against Mench; 5) a malicious prosecution claim against Mench; 6) a due process claim against Mench; and 7) a due process claim against Sokolovich.

On July 19, 2005, the court denied the defendants' motion to dismiss counts one, three, five, and six. The order states that plaintiff conceded that "his due process claims are based on the lack of a pre-termination hearing on January 17, 2003 and that he is not contending that there was a lack of a post-termination hearing." On November 14, 2005, Koltonuk stipulated that he voluntarily discontinued all claims against Mench, and the court issued an order to that effect. Thus, counts four, five, and six were dismissed.

On December 15, 2005, the parties filed cross motions for summary judgment. The Borough seeks judgment on all counts, while Koltonuk seeks judgment only on count one. Additionally, in replying to the Borough's motion for summary judgment, Koltonuk agreed to dismiss counts three and seven, which terminates the only claim against Sokolovich. (Pl.'s Reply 4.) Accordingly, the court now must rule upon only counts one and two, and the Borough is the

only remaining defendant.[3]

## II. Standard of Review

A court may only grant a motion for summary judgement, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

---

[3] Because the Borough is the only remaining defendant, the court will use the singular "defendant" (or simply, "Borough") rather than the plural "defendants," despite the fact that the motion for summary judgment was submitted by defendants Sokolovich and the Borough.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

**III. Discussion**

**A. Procedural Due Process**

Koltonuk's first count alleges that the Borough terminated his employment without providing him the due process guaranteed by the Fourteenth Amendment.  He believes that both his pretermination and posttermination hearings were constitutionally inadequate.  The Borough, on the other hand, argues that Koltonuk did receive sufficient process because the Borough provided him with a pretermination hearing and scheduled a posttermination hearing, which Koltonuk cancelled.  Both parties move for summary judgment on this claim.  The court concludes that Koltonuk has failed to present sufficient evidence for a jury to find that his due process rights were violated and will grant summary judgment to the Borough on this claim.[4]

Koltonuk brings his due process claim pursuant to 42 U.S.C. § 1983, which "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).  To obtain relief under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of state law,[5] violated the plaintiff's federal constitutional or statutory rights.  *Sameric Corp. of Del., Inc. v. City of Philadelphia*, 142

_____

[4] The Third Circuit has ruled that a public employee can challenge his termination through a procedural – but not substantive – due process claim.  *See Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000) (ruling that tenured public employment is not a fundamental property interest entitled to substantive due process protection).  As such, the court will evaluate Koltonuk's claim as only alleging a violation of his right to procedural due process.

[5] The parties agree that the Borough acted under color of state law in terminating Koltonuk.

F.3d 582, 590 (3d Cir. 1998).  When a party claims to have been deprived of an interest without procedural due process, the court must first consider whether the individual's interest is encompassed within the Fourteenth Amendment's protection of life, liberty, or property.  *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).  If the individual does have such a protected interest, the court must then evaluate whether the procedures that the state actor provided accorded the plaintiff with adequate process.  *Id.*

In this case, Koltonuk claims that his employment constitutes property under the Fourteenth Amendment.  To have a property interest in a job, a person must have a legitimate entitlement to continued employment.  *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005). Property interests "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"  *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532 (1985) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).  The Supreme Court has held that public employees who may be dismissed only for cause have a property interest in their continued employment.  *See Gilbert v. Homar*, 520 U.S. 924, 929 (1997).  Koltonuk notes that pursuant to 53 Pa. Cons. Stat. § 46190, he could only be removed from his position for one of five enumerated grounds.  Accordingly, he did have a property interest in his employment recognized by the Fourteenth Amendment, and the court must consider whether he received adequate process in connection with his discharge.

The Supreme Court has held that "a public employee dismissable only for cause [is] entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing."  *Gilbert*, 520 U.S. at 929.  Koltonuk challenges the adequacy of both his pretermination and posttermination hearings.

9

### 1. Pretermination Hearing

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985), the Supreme Court concluded that a public employee with a property interest in his job is entitled to a pretermination hearing. However, "the pretermination 'hearing,' though necessary, need not be elaborate." *Id.* at 545. The hearing "need not definitively resolve the propriety of the discharge"; rather, "[i]t should be an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-46. Thus, in the pretermination hearing the employee is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

The parties dispute whether Koltonuk's pretermination hearing satisfied the requirements of *Loudermill*. The Borough argues that the January 17, 2003 hearing, which Mench called a *Loudermill* hearing, complied with that case's requirements. In that hearing, Koltonuk was apprised of the charges against him arising out of the Turkey Hill incident, allowed to see the complaint from the clerk, permitted to respond to the charges, and told that he could be fired for the offense. Koltonuk argues, on the other hand, that the Borough did not fire him because of the Turkey Hill incident; it fired him because it did not credit his letter withdrawing his resignation. Thus, Koltonuk argues, because the pretermination hearing did not consider the timeliness of his letter rescinding his resignation, the pretermination hearing was constitutionally inadequate.

In order to evaluate the adequacy of the January 17, 2003 hearing, it is first necessary to review the manner in which Koltonuk's employment ended. While Koltonuk signed a resignation letter on January 17, 2003, he faxed a letter withdrawing his resignation on the same

10

day.  However, the Borough failed to consider (or rejected) Koltonuk's attempt to withdraw his resignation on three distinct occasions: 1) upon receipt of Koltonuk's revocation letter; 2) upon receipt of Koltonuk's lawyer's letter to the mayor dated January 27, 2003, which explained that Koltonuk had withdrawn his letter of resignation and asking when he should return to work; and 3) upon receipt of Koltonuk's lawyer's letter to the president of the Borough Council dated February 25, 2003, asking about the status of Koltonuk's employment.  Despite being informed on multiple occasions that Koltonuk had withdrawn his resignation, when the Borough Council met on March 10, 2003, it treated Koltonuk's letter as one seeking reinstatement.  Since no member of the council moved to reinstate Koltonuk, Council deemed the issue closed.

The Borough's failure to recognize Koltonuk's revocation letter was contrary to Pennsylvania law.[6]  In *Borough of California v. Horner*, 565 A.2d 1250, 1251 (Pa. Commw. Ct. 1989), the court held that "a resignation is not effective until it has been accepted by the municipal body," and therefore, "[r]esignations can be rescinded or withdrawn prior to the acceptance by the governing body."  The Borough concedes that it did not accept Koltonuk's resignation before he revoked it; thus Koltonuk effectively revoked his resignation.  In a Pennsylvania case where a Borough refused to recognize an employee's revocation of his resignation letter and reinstate him, that action "caused [the employee's] service to be terminated."  *Iorio v. Borough of Carnegie*, 487 A.2d 53, 54 (Pa. Commw. Ct. 1985).  Thus, under Pennsylvania law, when the Borough ignored Koltonuk's revocation letter and refused to

---

[6] However, to the extent that Koltonuk argues that the Borough's failure to follow its own procedures amounted to a per se violation of his due process rights, the court rejects his argument.  *See Kompare v. Stein*, 801 F.2d 883, 888 (7th Cir. 1986) (stating "'violation of state law . . . , without more, is not a violation of the federal right to procedural due process.'" (quoting *Miller v. Carson*, 563 F.2d 757, 760 n.7 (5th Cir. 1977))).

allow him to return to work, it terminated him.

As noted, the Borough argues that it provided Koltonuk with adequate pretermination process because it conducted a *Loudermill* hearing after the Turkey Hill incident.  Koltonuk, on the other hand, argues that he was entitled to a hearing concerning the timeliness of his rescission letter.  As explained below, the court concludes that the Borough accorded Koltonuk adequate pretermination process.

Koltonuk argues that the *Loudermill* hearing, during which Koltonuk was provided notice of the charges concerning the Turkey Hill incident, allowed to read the complaint from the Turkey Hill clerk, informed that the Borough considered this a serious offense and would suspend and consider firing him, and allowed to present his side of the story, is only relevant to the Turkey Hill incident.  However, the Turkey Hill incident and the Borough's refusal to honor Koltonuk's rescission of his resignation are not entirely isolated events; they are closely interconnected and the latter flowed from the former.  A review of the record shows that three days after the Turkey Hill incident, the Borough pressed Koltonuk to resign because of that incident.  During the meeting in which Mench sought Koltonuk's resignation, Mench (apparently after consulting with the mayor and solicitor) expressed the Borough's intention to take adverse action against Koltonuk because of the Turkey Hill incident, stating that if Koltonuk did not resign he would be suspended and could/would be fired.  The Turkey Hill incident was the only reason that the Borough identified as justification for these harsh disciplinary measures.  After hearing the Borough's view of the Turkey Hill incident, Koltonuk signed a letter of resignation.

Thus, at this point, the Borough had provided Koltonuk with his guaranteed due process concerning the Turkey Hill incident.  The Borough had provided Koltonuk notice of the charges

against him, an explanation of the Borough's evidence, and an opportunity to explain his side of the story. *See Loudermill*, 470 U.S. at 546. Koltonuk took advantage of this opportunity, and testified that he explained to Mench and Sokolovich that he believed that he had permission to take the bags. He does not allege that he wished to present further explanation. In addition to serving as a pretermination hearing concerning the Turkey Hill incident, the hearing also put Koltonuk on notice that the Borough wanted his employment to end because of the incident, which is the factual underpinning of the Borough's subsequent refusal to allow Koltonuk to return to work. *See McDaniels v. Flick*, 59 F.3d 446, 457 (3d Cir. 1995) ("We have held, however, that pretermination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee "the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges.").

After the *Loudermill* hearing, Koltonuk faxed a letter rescinding his resignation; however, the Borough did not respond. Koltonuk understood that the Borough's failure to acknowledge his letter meant that the Borough had terminated him; Koltonuk's lawyer stated in a letter dated February 25, 2003 that unless he heard otherwise, he would work under such an assumption. Throughout this correspondence, Koltonuk (through his lawyer) knew the Borough was relying on the resignation letter, knew the contents of the letter which he wrote, and had the opportunity to present his side of this issue. Indeed, he ultimately convinced the Borough that his understanding of the legal significance of his letter of rescission was correct. A second *Loudermill* hearing relating to the resignation and rescission letters would have been a pointless act since Koltonuk was already aware of the charge, his employer's evidence, and had an opportunity to respond – which he had already done through his attorney. Moreover, it is clear

13

that there would be "no underlying factual dispute to be hashed out" in such a hearing, *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000); rather, the facts concerning the rescission and resignation letters were undisputed and the Borough had decided to end Koltonuk's employment, and whether the letter of resignation was effective or not was of no consequence.  *See id.* (stating that *Codd v. Velger*, 429 U.S. 624 (1977) stands for the proposition that "a pre-termination hearing [is] not required when there [is] no underlying factual dispute to be hashed out in the hearing").

In this case, the Borough did offer a pretermination hearing on the underlying issue  – the Turkey Hill incident – that was clearly broad enough to provide Koltonuk notice of the charges against him, an explanation of the Borough's evidence, and an opportunity to present his side of the story, *see Loudermill*, 470 U.S. at 546.  Koltonuk also had the opportunity (which he took advantage of) to supplement his responses through his lawyer, which allowed him to challenge the Borough's legal theory concerning the effect of his rescission letter.  No purpose would have been served by a second pretermination hearing since Koltonuk was already fully aware of the issue.  The Third Circuit has stated that "[t]he Constitution does not require perfection at every stage of a process."  *Alvin*, 227 F.3d at 119.  Here, the Borough provided Koltonuk with pretermination process, which was not perfect, but was constitutionally adequate, particularly in light of the availability of a posttermination hearing.

While the availability of posttermination process does not excuse a failure to provide pretermination process, *Alvin*, 227 F.3d at 120, the former is relevant to an evaluation of the adequacy of the latter.  In *McDaniels*, the Third Circuit considered whether an impartial decisionmaker is required at the pretermination hearing, and began with the principle that "'[t]he

14

constitutional [procedural due process] violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.'" 59 F.3d at 460 (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).  Based on this foundation, the court ruled that:

> [A] discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker.

*Id.*  Similarly, in this case Koltonuk was entitled to a posttermination hearing,[7] but, as has been noted, failed to avail himself of that right.  At the posttermination hearing, the Borough would have been compelled to justify its decision to terminate Koltonuk, and Koltonuk could have challenged both the Borough's treatment of his rescission letter and its reliance on the Turkey Hill incident.  Thus, the Borough provided an extra layer of procedure that could have protected Koltonuk's rights and would have ensured that the procedural anomaly in this case (Koltonuk's rescission of his resignation) did not go unreviewed.

Thus, the court concludes that Koltonuk has failed to produce sufficient evidence from which a reasonable jury could find that his pretermination hearing was constitutionally inadequate and violated his due process rights.

### 2. Posttermination Hearing

Koltonuk also challenges the adequacy of his posttermination hearing.  He argues that pursuing the posttermination hearing would have been futile because the Commission would not

---

[7] Under 53 Pa. Cons. Stat. § 46191, an individual who is fired has the right to demand a hearing by the Civil Service Commission.  Further, § 46191 also states that the Commission's decision is appealable to the court of common pleas.

have had jurisdiction to consider his case.  However, this argument is without merit.

First of all, it seems that Koltonuk may be barred from challenging the adequacy of the hearing by the doctrine of judicial estoppel.  The doctrine of judicial estoppel "prevents a party from asserting inconsistent claims in different legal proceedings."  *Mintze v. Am. Fin. Servs., Inc.*, 434 F.3d 222, 232 (3d Cir. 2006).  The Supreme Court has identified three general factors that inform the decision of whether to apply judicial estoppel: 1) whether a party's later position is "'clearly inconsistent' with its earlier position"; 2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and 3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).  In this case, while defending against the Borough's motion to dismiss, Koltonuk represented that his due process claim only challenged the adequacy of his pretermination hearing.  The court accepted this position and included it in its July 19, 2005 order, which states that Koltonuk conceded that "his due process claims are based on the lack of a pre-termination hearing on January 17, 2003 and that he is not contending that there was a lack of a post-termination hearing."  Based in part on that representation, the court denied the Borough's motion to dismiss.  Now that the exigency of the motion to dismiss has abated, however, Koltonuk seeks to change his position and challenge the posttermination hearing.  This likely would work to the detriment of the Borough, which presumably has relied upon the court's January 17, 2003 order and developed its case on the assumption that the posttermination hearing was not at issue.  It is not necessary to decide this

issue, however.

Even if the court considers the argument on the merits, it is unavailing.  Relying on *Civil Service Commission of Jim Thorpe v. Kuhn*, 480 A.2d 1327 (Pa. Commw. Ct. 1984), Koltonuk argues that because the Borough never formally fired him, the Commission would not have had jurisdiction over his case.  In *Kuhn*, a police officer was charged by his superiors with violating department regulations, and in lieu of reaching its own determination about how to discipline the officer, the Borough Council resolved to turn the matter over to the Civil Service Commission Board for review and recommendation.  *Id.* at 1328.  The Commission reviewed the officer's conduct and determined that he should be terminated.  *Id.* at 1328-29.  The Commonwealth Court reversed the Commission's decision, ruling that "[i]t is the borough council [which] has the primary responsibility and discretion for determining whether or not and how a police officer should be disciplined," *id.* at 1329 (internal quotation omitted), and that "[u]ntil such time as the Borough Council takes final action, there is, by law, no adjudicable issue to be placed before the Commission and any action it takes was correctly deemed a nullity by the common pleas court," *id.*

In Koltonuk's case, however, the Borough did not attempt to delegate its decisionmaking authority to the Commission; it made a final decision, albeit due to its failure to act.  Indeed, Koltonuk's situation is very similar to that of the plaintiff in *Iorio v. Borough of Carnegie*, 487 A.2d 53 (Pa. Commw. Ct. 1985).  In *Iorio*, a patrolman sent a letter of resignation to the mayor of the Borough, but then rescinded his resignation before the Borough had formally accepted the resignation.  *Id.* at 54.  However, the Borough failed to recognize the patrolman's revocation and reinstate him.  *Id.*  The patrolman argued that because the Borough had not removed him for one

17

of the reasons enumerated in 53 Pa. Cons. Stat. § 46190 and had not provided him with a removal letter specifying the grounds for its refusal to reinstate him, he "had nothing to appeal to the Civil Service Commission." *Id.* at 54-55.  The court rejected these arguments, ruling that: 1) because the Borough refused to recognize the patrolman's revocation letter and reinstate him, it had removed him; and 2) the Commission had jurisdiction to consider *all* removals.  *Id.* at 54.  Koltonuk's situation is in all relevant respects identical to that of the patrolman in *Iorio*, and thus, *Iorio*'s conclusion controls here.  Accordingly, the court concludes that the Commission would have had jurisdiction to consider Koltonuk's claims, and the Borough is entitled to judgment on this claim as a matter of law.

In this case, Koltonuk initially requested a hearing on his rescission of his resignation letter.  The Borough admitted error on the subject, argued instead that it had fired Koltonuk for the Turkey Hill incident, and agreed that Koltonuk was entitled to a posttermination hearing.  Thus, Koltonuk had the opportunity for a full hearing before the Commission on both issues.  The hearing did not actually occur only because Koltonuk withdrew his request for the hearing.  Thus, no reasonable jury could find that Koltonuk's due process right to a posttermination hearing was violated.  *See Alvin*, 227 F.3d at 116 ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.").

Because the court concludes that no reasonable jury could find that Koltonuk's due process rights were violated by either his pretermination or posttermination hearings, the court will grant the Borough's motion for summary judgment on this claim.

**B. Retaliation**

18

Koltonuk's second count alleges that the Borough filed criminal charges against him in retaliation for his pursuit of posttermination remedies, in violation of his First Amendment rights. The Borough claims that it should be granted summary judgment on this claim for two reasons. First, the Borough claims that the decision to file criminal charges against Koltonuk was not part of the custom or policy of the Borough, and accordingly, it cannot be liable under 42 U.S.C. § 1983. Second, the Borough argues that it had probable cause to charge Koltonuk, and the existence of probable cause defeats a retaliatory prosecution claim. However, because the court finds that there are genuine issues of material fact concerning whether a policymaker ordered that criminal charges be filed against Koltonuk and whether the Borough had probable cause to file the charges, the court will deny the Borough's motion.

### 1. Borough Policy

In *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court determined that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." However, the Court also held that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort," *id.* at 691; that is, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *id.* The Third Circuit has explained that there are three ways in which a municipality may be liable for the torts of its employees under § 1983:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City*

*of Cincinnati*, 475 U.S. 469, 480-81 (1986); third, the municipality will be liable if
an official with authority has ratified the unconstitutional actions of a subordinate,
rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*,
485 U.S. 112, 127 (1988).

*McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005).

This case implicates the second method of establishing municipal liability.  In *Pembaur*,

the Supreme Court explained that under *Monell*, "recovery from a municipality is limited to acts

that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has

officially sanctioned or ordered."  475 U.S. at 480.  The Court explained that "a government

frequently chooses a course of action tailored to a particular situation and not intended to control

decisions in later situations," and therefore, "if the decision to adopt that particular course of

action is properly made by that government's authorized decisionmakers, it surely represents an

act of official government 'policy' as that term is commonly understood."  *Id.* at 481.  Further,

"where action is directed by those who establish governmental policy, the municipality is equally

responsible whether that action is to be taken only once or to be taken repeatedly."  *Id.*

Thus, since the decision to file criminal charges against Koltonuk was a single act, in

order for the Borough to be liable under § 1983 the decision must have been made by a Borough

policymaker.  *See Pembaur*, 475 U.S. at 481.  The Third Circuit has explained that "[t]he

question of who is a 'policymaker' is a question of state law."  *Andrews v. City of Philadelphia*,

895 F.2d 1469, 1481 (3d Cir. 1990).  "In looking to state law, a court must determine which

official has final, unreviewable discretion to make a decision or take an action."  *Id.*

The Borough argues that the decision to file a criminal charge against Koltonuk was made

entirely by Officer Sokolovich, who did not have policymaking authority with respect to bringing

criminal charges.  Koltonuk, on the other hand, argues that Sokolovich was instructed to file the charges by the Borough's solicitor, John Speicher.

As a preliminary matter, it is clear that Koltonuk is correct that Speicher was involved in the decision to file the criminal complaint.  In Sokolovich's affidavit he stated "[a]fter having consulted with the Borough Solicitor and having considered all of the foregoing information, I filed theft-related charges against Officer Koltonuk."  (Sokolovich Aff. ¶ 8.)  Further, the police chief, Edward Mench, testified that Sokolovich filed the complaint "[u]nder the direction of our solicitor."  (Mench Dep. 20:10.)  Thus, because a reasonable jury could find that Speicher was involved in the decision, the fact that Sokolovich was not a policymaker is immaterial.  Indeed, because the Supreme Court focused on the individual who made the "*decision* to adopt that particular course of action," *Pembaur*, 475 U.S. at 481 (emphasis added), not the individual who eventually implemented that course of action, the court will follow the chain of command to determine who made the initial decision to file a criminal complaint.

However, it does not appear that Speicher, as the Borough's solicitor, was a policymaker in this area.  Under Pennsylvania law, a borough solicitor has control of the Borough's legal matters, *see* 53 Pa. Cons. Stat. § 46116; however, the solicitor may act only at the request of the council or the mayor, *see* 53 Pa. Cons. Stat. § 46117(a).[8]  Indeed, the Pennsylvania Supreme

_____

[8] 53 Pa. Cons. Stat. § 46117(a) describes the duties of the borough solicitor as follows: The borough solicitor, when directed or requested so to do by council or the mayor, shall prepare or approve such bonds, obligations, contracts, leases, conveyances, ordinances and assurances to which the borough or any department thereof may be a party; he shall commence and prosecute all actions brought by the borough for or on account of any of the estates, rights, trusts, privileges, claims, or demands, as well as defend all actions or suits against the borough, or any officer thereof, wherein or whereby any of the estates, rights, privileges, trusts, ordinances, or accounts, of the borough, or any department thereof, may be brought in question before any court in

Court has explained that "the solicitor is responsible only to the appointing body, and *may act only pursuant to that body's authorization*. He owes no independent duties to the public, and exercises none of the powers of sovereignty." *Ballou v. State Ethics Comm'n*, 436 A.2d 186, 189 (Pa. 1981) (emphasis added).

Based on the fact that the solicitor lacks independent authority and derives all of his power from the mayor or council, it does not appear that Speicher was a policymaker; rather, any decision that he could make would be reviewable by the individual that requested him to act. *See Andrews*, 895 F.2d at 1481 (stating that a policymaker is an individual with "final, unreviewable discretion to make a decision or take an action"). However, for that very reason, a reasonable jury could find that his communication to Sokolovich was ordered by an individual with policymaking authority. Speicher would have been acting outside his authority if he independently ordered Sokolovich to file a criminal complaint. Indeed, one portion of Mench's testimony, although ambiguous in its use of pronouns, appears to state that Speicher did act at the behest of a higher authority. After being asked "[i]n your years as chief, were there any other cases in which the solicitor initiated a criminal prosecution of somebody?" – Mench stated that "[h]e was contacted by the Borough. I wanted to know what steps to take.[9] He stated to the Borough [at this point the testimony is interrupted]." (Mench Dep. 20:14-24.) Based on this

_____

the Commonwealth; and shall do every professional act incident to the office which he may be authorized or required to do by the council or the mayor. He shall, whenever required, furnish the council, or committees thereof, the mayor, or the head of department, with his opinion in writing upon any question of law which may be submitted by any of them in their official capacities.

[9] This sentence seems to contradict Mench's other testimony that he was in no way involved in the decision to file the criminal complaint. (*See* Def.'s Ex. 22 at 22.)

statement, a reasonable jury could find that some official from the Borough may have contacted Speicher about charging Koltonuk, and Speicher provided advice to help effectuate that goal. This would be perfectly consistent with the solicitor's role, as described in the statute and caselaw.  Additionally, it would be consistent with the practice that has existed throughout the Koltonuk controversy: Speicher and the mayor ordered that Mench create a letter of resignation for Koltonuk (Mench Dep. 16:18-19), and Speicher was the author of the letter first setting out the Borough's reasons for firing Koltonuk (Def.'s Ex. 16).  While Speicher was often the spokesperson of the Borough for legal matters, he was not necessarily the one making the decisions.  A reasonable jury could find that would be either the mayor[10] or the council.  Thus, based on Mench's statement, which the court interprets as meaning that the solicitor was contacted regarding filing the criminal complaint by the "Borough"; the solicitor's close coordination with the mayor and the council on the letter of resignation and the formal explanation of Koltonuk's discharge; and the Pennsylvania law describing the solicitor's duties, the court concludes that this case presents a genuine issue of material fact concerning the origination of the order that criminal charges be filed against Koltonuk.

**2. Probable Cause**

The Borough also argues that in order to establish a retaliatory prosecution claim the plaintiff must show that the defendant did not have probable cause to prosecute; it argues that the

---

[10] The mayor would be a policymaker with respect to bringing criminal charges.  As the Third Circuit has explained, "the Mayor of a Pennsylvania Borough is its chief law enforcement officer." *Pennsylvania v. Porter*, 659 F.2d 306, 310 (3d Cir. 1981).  The mayor has "full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties."  53 Pa. Cons. Stat. § 46121.

Borough did have probable cause to charge Koltonuk with theft, and that the existence of probable cause defeats Koltonuk's claim.  However, the court finds that based on *Merkle v. Upper Dublin School District*, 211 F.3d 782 (3d Cir. 2000), a reasonable juror could find that the Borough did not have probable cause to charge Koltonuk.[11]

In general, a plaintiff can demonstrate First Amendment retaliation by showing: "(1) that [the plaintiff] engaged in protected activity; (2) that the government responded with retaliation; and (3) that the protected activity was the cause of the retaliation."[12]  *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003).  Additionally, while there once was a circuit split regarding whether a lack of probable cause to prosecute is an element of retaliatory prosecution, the recent Supreme Court case of *Hartman v. Moore*, No. 04-1495, 2006 WL 1082842, at *2 (U.S. April 26, 2006), has settled that debate, ruling that it is a necessary element.  Thus, the court must determine whether a reasonable jury could find that the Borough did not have probable cause to charge Koltonuk.

"[P]robable cause is defined in terms and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing a crime."  *Merkle*, 211 F.3d

---

[11] As a general rule, if there is probable cause to believe that an individual committed an offense, the decision to prosecute rests in the prosecutor's discretion.  *Wayte v. United States*, 470 U.S. 598, 607 (1985).  Thus, to be precise, it was the prosecutor that prosecuted Koltonuk; the Borough only filed charges against him.  However, in *Merkle*, the Third Circuit, in analyzing a malicious prosecution claim, explained that the "action of the School District in initiating the criminal proceedings and pressing unfounded criminal charges against Merkle can render the District liable for its major role in a malicious prosecution."  211 F.3d at 794.  Thus, the court determined that the necessary inquiry was "whether the School Defendants had probable cause to pursue Merkle's prosecution."  *Id.*  Similarly, in this case the court will evaluate whether the Borough had probable cause to pursue Koltonuk's prosecution.

[12] For purposes of this action, the Borough does not challenge the viability of Koltonuk's claim on any of these three grounds.

24

at 789 (citing *Sharrar v. Felsing*, 128 F.3d 810, 817-18 (3d Cir. 1997)).  The standard "requires

more than mere suspicion; however, it does not require that the [defendant] have evidence

sufficient to prove guilt beyond a reasonable doubt."  *Orsatti v. N.J. State Police*, 71 F.3d 480,

482-83 (3d Cir. 1995).  Finally, probable cause "is a fluid concept – turning on the assessment of

probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of

legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

    The court concludes that a reasonable jury could find that the Borough did not have

probable cause to file the criminal complaint against Koltonuk.  The Third Circuit's reasoning in

*Merkle* controls this determination.  *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782 (3d

Cir. 2000).  In *Merkle*, an elementary school principal witnessed Merkle, an art teacher, load 144

unopened boxes of crayons into her car.  *Id.* at 786.  The principal asked Merkle why she was

taking the crayons, and Merkle explained that the crayons "weren't useful in the curriculum," and

that she was going to donate them to a community center.  *Id.*  The principal asked Merkle if she

had authorization to donate the crayons, and upon finding that she did not, ordered her to return

the crayons to the school.  *Id.*  Merkle complied.  *Id.*  The principal then called the

superintendent, who instructed her to report the incident to the police department (and also

reported the incident himself).  *Id.* at 786-87.  The next day a detective met with the principal,

and based on that conversation filed a criminal complaint against Merkle.  *Id.* at 787.  Merkle

was eventually arrested, charged with theft by taking pursuant to 18 Pa. Cons. Stat. § 3921, and

suspended without pay.  *Id.*  Merkle then filed suit, arguing, *inter alia*, that the school district

maliciously prosecuted her in violation of her Sixth Amendment rights and retaliated against her

for her outspoken support of multiculturalism in violation of her First Amendment rights.  *Id.* at

25

791.

In reviewing Merkle's claims, the Third Circuit viewed Merkle's First Amendment claim through the lens of malicious prosecution. *See Merkle*, 211 F.3d at 791 (stating that at common law, a plaintiff alleging malicious prosecution must show "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice"). The court explained that based on the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994), a "claim of malicious prosecution under section 1983 cannot be based on substantive due process considerations, but instead must be based on a provision of the Bill of Rights providing an explicit textual source of constitutional protection." *Merkle*, 211 F.3d at 792 (internal quotation omitted). The court further explained that in *Torres v. McLaughlin*, 163 F.3d 169, 173 (3d Cir. 1998), the Third Circuit "read *Albright* as standing for the proposition that a section 1983 malicious prosecution claim could be based on a constitutional provision other than the Fourth Amendment, including the procedural component of the Due Process Clause, so long as it was not based on substantive due process." *Merkle*, 211 F.3d at 792. The court then stated that "Merkle predicates her constitutional malicious prosecution claim on the First and Sixth Amendments." *Id.* In reviewing Merkle's First Amendment claim, the court first analyzed whether Merkle had established First Amendment retaliation, using a burden-shifting framework that included three steps: (1) "Merkle must demonstrate that her speech was protected"; (2) "Merkle must show that her speech was a motivating factor in the alleged retaliatory action"; and (3) "the School Defendants may defeat Merkle's claim by establishing that it would have taken the same adverse action against Merkle

26

even in the absence of her protected speech." *Id.* at 793.  The court further explained that "whether these defendants' actions against Merkle were retaliatory is, for purposes of summary judgment, influenced by the strength of Merkle's claim against them for common law malicious prosecution." *Id.* at 794.

Thus, as part of its discussion of Merkle's retaliatory prosecution claim, the court considered whether the school district had probable cause to prosecute Merkle. *Id.* at 794-96. The court discussed the requisite mental state for theft and quoted the Pennsylvania Supreme Court's statement that "'[i]t has been repeatedly held that when one takes property under a claim of right, even though mistaken, larceny is not committed.'" *Id.* at 796 (quoting *Thomas v. Kessler*, 5 A.2d 187, 188 (Pa. 1939)).  The court explained that when Merkle removed the crayons from school, she did so under a claim of right: she believed that she had the authority to dispose of the property. *Id.*  Thus, the court concluded that "[a]n employer incurs no risk of a suit for malicious prosecution when the employer has probable cause to believe that its employee had committed a criminal violation.  Here, however, the employer never had cause to find a criminal violation, because it knew that Merkle acted without criminal intent." *Id.*

The facts of this case are almost identical to those of *Merkle*.  Both Merkle and Koltonuk were charged with theft by taking, and just as Merkle believed that she had the right to donate the crayons, there is ample evidence that Koltonuk believed that he had the right to take trash bags for police use.  Also, both the school district in *Merkle* and the police officers in this case were aware of those beliefs; indeed, Sokolovich, who actually filed the criminal complaint, and Mench, the police chief, were in the room with Koltonuk during the *Loudermill* hearing when Koltonuk first offered this explanation.  Additionally, in *Merkle* the plaintiff was accused of

27

taking items of greater quantity (144 boxes of crayons in *Merkle*, compared to two or three garbage bags here) and value (the school district in *Merkle* contended the crayons were worth between \$250 and \$400, *id.* at 786 n.2, while the bags in this case were worth about five cents each (Def.'s Ex. 19 at 37)).  Further, it appears that the Turkey Hill store from which Merkle took the trash bags often provided coffee to police officers free of charge (Def.'s Ex. 5) and had given bags to Koltonuk in the past (Koltonuk Dep. 60:4-8), which provides support for Koltonuk's belief that he was permitted to take the bags.  Finally, the police officers who charged Koltonuk, as law enforcement officials, were better equipped than the school district in *Merkle* to appreciate the requirement that a criminal act be accompanied by a specific state of mind.  Thus, if a reasonable jury could find that the school district in *Merkle* did not have probable cause to prosecute Merkle, a reasonable jury could also find that the Borough in this case did not have probable cause to prosecute *Koltonuk.*

      Accordingly, the court will deny the Borough's motion for summary judgment on this claim.

      An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOHN KOLTONUK<br>Plaintiff, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| Borough OF LAURELDALE, et al.,<br>Defendants. | : | NO. 05-0106 |

## Order

And now, this _____ day of July 2006, upon consideration of defendants Borough of Laureldale and Mark Sokolovich's motion for summary judgment (Document No. 24), plaintiff John Koltonuk's motion for partial summary judgment (Doc. No. 25), and both parties' responses, **IT IS HEREBY ORDERED** that:

1.  Koltonuk's motion for partial summary judgment on his procedural due process claim (count one) is **DENIED**.

2. The defendants' motion for summary judgment on Koltonuk's procedural due process claim (count one) is **GRANTED**, and judgment is entered in favor of defendants and against plaintiff on that claim.

3.  The defendants' motion for summary judgment on Koltonuk's claim of retaliation (count two) is **DENIED**.

4. The plaintiff having voluntarily discontinued counts three and seven, those counts are **DISMISSED** with prejudice.

5. Defendant Mark Sokolovich is **DISMISSED** as a party to this action.

6.  Trial is **SCHEDULED** for <u>**November 20, 2006 in Courtroom 14-B at 10:00 A.M.**</u>

/s William H. Yohn Jr., Judge

_____

William H. Yohn Jr., Judge